Filed 3/17/22  Diller v. Richardson CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| RONALD DILLER,<br>    Plaintiff and Appellant,<br>v.<br><br>THOMAS RICHARDSON,<br>Individually and as<br>Co-Trustee, etc., et al.,<br>    Defendants and Respondents. | A162139<br><br>(San Mateo County<br> Super. Ct. No. 18-PRO-01127) |

In this trust proceeding brought under the Probate Code, plaintiff Ronald Diller (Ron)[1] challenges the administration of a marital trust created pursuant to a family trust established by his now-deceased parents Helen and Sanford Diller.  The appeal is from a judgment of dismissal in favor of defendants Thomas Richardson (Richardson) (co-trustee of the marital trust) and the law firm of Arnold & Porter Kaye Scholer, LLP (Arnold & Porter) (trust counsel) following an order sustaining their demurrer to the second amended petition without leave to amend. [2]

---

[1]     For ease of reference, and with no disrespect intended, we refer to certain parties by their first names.

[2]     Ron also named as a defendant his sister Jaclyn Safier (Jackie), both individually and as a trustee.  Jackie is not a party to this appeal.

1

We conclude the pleading contains sufficient factual allegations to withstand demurrer. Therefore, we reverse the judgment of dismissal and remand for further proceedings.

## BACKGROUND[3]

In February 1981, Ron's parents – Helen and Sanford Diller – created a family trust, entitled the "DNS Trust," delineating how they wished their assets to be dispersed after their deaths.[4] Helen died in 2015 and Sanford died in 2018.

### A. The DNS Trust

The DNS Trust provided that, following Helen's death, the assets in the trust were to be allocated to the following four sub-trusts after expenses were paid and certain bequests made: (1) a Marital Trust; (2) a Survivor's Trust, (3) a Family Trust; and (4) a reverse "QTIP Marital Trust." The DNS Trust allowed Sanford, as the trustee of the Marital Trust, to select and appoint a co-trustee of the Marital Trust; he selected Richardson.

The DNS Trust provided for the distribution of principal and income from the Marital Trust during the surviving spouse's life as follows:

---

[3] Because this case concerns a demurrer for failure to state a cause of action, we set forth pertinent facts as alleged in the second amended petition to give context to our resolution of the appeal. Our factual recitation should not be read as expressing an opinion as to the accuracy of these factual allegations.

[4] The second amended petition did not include a copy of the DNS Trust, which was "amended and restated many times over the years." Because the parties cite to the provisions in the "Sixteenth Amendment and Complete Restatement of the DNS Trust," of which the superior court took judicial notice in deciding an earlier demurrer, we use that version in resolving this appeal.

"1.    The Trustees shall distribute to the Surviving Spouse the net income of the [Marital Trust] at least annually.

"2.    The Trustees shall distribute to the Surviving Spouse as much of the principal of [the Marital Trust] as the Trustees may from time to time determine for the Surviving Spouse's health, education, maintenance and support, in his or her accustomed manner of living.

"3.    The Trustees shall distribute to the Surviving Spouse as much of the principal of the [Marital Trust] as the Trustees (excluding, however, any Interested Trustee) may from time to time determine, for any purpose."

The DNS Trust defined "Interested Trustee" and, conversely, "Disinterested Trustee" as follows:

" 'Interested Trustee' means, for any trust, a Trustee who is (i) a transferor of property to the trust, including a person whose qualified disclaimer resulted in property passing to the trust; or (ii) a person who is or in the future may be eligible to receive income or principal pursuant to the terms of the trust.  A Trustee described in (i) is an Interested Trustee only with respect to transferred property (including income and gain on, and reinvestment of, such property).  A person is described in (ii) even if he or she has a remote contingent remainder interest.  A Trustee who is not an Interested Trustee is a 'Disinterested Trustee.' "

## B.    Ron's Petition

By his second amended petition brought pursuant to Probate Code sections 850 and 859, Ron, as a beneficiary of the Marital Trust, seeks the return of approximately $1.2 billion in assets, which were allegedly wrongfully transferred from the Marital Trust to Sanford for placement in the Survivor's Trust (hereinafter also referred to as "transfer from Marital Trust to Survivor's Trust").  The transferred

3

assets are allegedly now being held by his sister, Jackie, "as trustee of the Survivor's Trust and/or Jaclyn Safier Management Trust."

The "heart" of the second amended petition is found at paragraphs 9 through 11, in which it is alleged that, "[o]f the sub-trusts, perhaps none was more important than [the] Marital Trust, which became irrevocable upon [Helen's] death and from which Sanford (aided and abetted by his co-conspirator, agent and servant Richardson and Arnold & Porter) improperly 'funneled' out of the Marital Trust its entire contents, i.e., **_over $1.2 billion_** in assets.  This is directly contrary not only to the terms of the trust but . . . also to Helen's stated wishes."  (Bolded and italicized language in original.)

The pleading goes on to allege, "More specifically, prior to her death, Helen made known her intention to leave a 'legacy' for her children and grandchildren from her one-half share of the family fortune.  Documentary evidence confirms that Sanford did not like Helen's plans; so, aided and abetted by his . . . agent and servant Richardson and Arnold & Porter, Sanford and Respondents conspired and concocted a scheme to 'funnel' over $1.2 billion in assets out of [the] Marital Trust to the Survivor's Trust, for Sanford's personal use."  According to Ron, "Sanford, aided by his agent, servant and co-conspirator Richardson, and with Jackie's tacit approval, put in motion and consummated a scheme to eviscerate Helen's dispositive plans and testamentary wishes completely by (i) gaining control over all the assets in the Marital Trust, and (ii) then disposing of them (along with his half of the family fortune) as he saw fit – and in ways that were utterly inconsistent with Helen's intent.  The scheme is expressly

4

confirmed in a letter from Richardson to Sanford, dated March 4, 2015, sent shortly after Helen's death: The letter stated [in pertinent part]:

> "The DNS Trust was fully amendable while you and Helen were both alive.  But because the DNS Trust was a joint trust between you and Helen, and Helen is now deceased, portions of the trust are now irrevocable.  Nevertheless, most of these changes can still be implemented. [¶]  . . .[¶]
>
> "Second, the changes that were to take effect at your death can be made but require several steps.  As currently drafted, the DNS Trust provides that Helen's property and her share of the community property passes to the Marital Trust for your benefit.  The terms of the Marital Trust provide for the disposition of these assets upon your death, but the Marital Trust can no longer be amended.  In order to preserve your ability to change the disposition of the assets at your death, we propose that all assets be distributed out of the Marital Trust to you, then contributed by you to the Survivor's Trust.  The Survivor's Trust is a separate trust under the DNS Trust that governs your property, and this Survivor's Trust remains fully amendable by you during your lifetime.  By funneling the property through the Marital Trust to you then back into the Survivor's Trust, we are able to keep all property in the DNS Trust but guarantee your ability to amend the terms of the trust and ultimate disposition of such property."

Hence, according to Ron, "Richardson documented a plan to 'funnel' assets out of [the] Marital Trust to Sanford by manipulating the Marital Trust language in ways that dishonored Helen's intent and fulfilled Sanford's intent instead.  This plan further relied on appointing an individual as Co-Trustee who would appear independent and disinterested on the surface, but who would really be completely controlled and subservient to Sanford, and, thus, an Interested Trustee."

In addressing the language of the trust, Ron asserted, among other things, that Richardson was not a " 'Disinterested Trustee,' " and

that the phrase " 'for any purpose' " could not be used to defeat public policy or Helen's intent, or to negate a breach of a trustee's duty of loyalty to all beneficiaries, . . . [but] . . . must be read to mean 'for any legitimate purpose intended by Helen.'  Here, Sanford had no need for the assets in the Marital Trust, as he had his own assets exceeding $1.2 [b]illion, which fully provided all requirements for his health, education, maintenance and support for the remainder of his life. Instead . . . the purpose of the transfer of assets from the Marital Trust to Sanford was a wrongful scheme and conspiracy undertaken wholly to allow Sanford to evade Helen's testamentary intent and the bequests she had made.  Such an intent violates public policy, the intent of the Marital Trust, the terms of the Marital Trust, and the fiduciary duties of Richardson and Sanford, rendering the transfer void or at leas[t] voidable by this petition. . . .  [B]ecause Richardson, as Helen's attorney, owed continuing duties of loyalty to her after she died, Richardson's fiduciary duties absolutely forbade him from acting contrary to her interests."

The second amended petition also alleged Ron was entitled to relief under Probate Code section 859 as "Sanford – aided and abetted by Richardson and Arnold & Porter and ratified by Jackie – in bad faith, wrongfully transferred over $1.2 billion in assets from the Marital Trust to himself, for his personal use and his ultimate disposition contrary to Helen's testamentary intent. . . ."

C.    **Demurrer Ruling**

The superior court sustained a demurrer to the second amended petition for relief under Probate Code sections 850 and 859 without leave to amend.  The court found the DNS Trust clearly permitted a

6

trustee to transfer assets from the Marital Trust to the Surviving Spouse, for any purpose, so long as that trustee was not an "Interested Trustee." The court noted that only conclusory allegations were added to the second amended petition and Ron again failed to allege facts showing that Richardson was an interested trustee. "Based on the clear language of the DNS Trust, and Ron's failure to allege Richardson was an 'Interested Trustee' as that term is defined in the Trust, the Court finds that any further attempt to amend would be futile." Following the entry of judgment in favor of Richardson and Arnold & Porter, this timely appeal ensued.

## ANALYSIS

Probate Code section 850 governs who may file a petition requesting that a court make an order under Part 19 of the Probate Code. The parties do not dispute that Ron has standing to file the petition.[5] Probate Code section 859 provides that, in addition to any other remedies available in law, "[i]f a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to . . . a trust . . ., the person shall be liable for twice the value of the property recovered by an action under this part," and the court may, in its discretion, award reasonable attorney fees and costs.

---

[5] Specifically, Ron seeks the return of the assets transferred to the Marital Trust, under Probate Code section 850, subdivision (3), which provides, in pertinent part, as follows: "(3) The trustee or any interested person [may seek relief] in any of the following cases: (A) Where the trustee is in possession of, or holds title to, real or personal property, and the property, or some interest is claimed to belong to another. (B) Where the trustee has a claim to real or personal property, title to or possession of which is held by another."

7

The second amended pleading alleges, in pertinent part, that Sanford (together with Richardson and Arnold & Porter) had consummated an arrangement to eviscerate Helen's dispositive plans "by (i) gaining control over all the assets in the Marital Trust, and (ii) then disposing of them (along with [Sanford's] half of the family fortune) as he saw fit," thereby amending the terms of the irrevocable Marital Trust and changing the ultimate disposition of the assets, contrary to Helen's intent and in violation of duties of loyalty that were owed by Richardson and Arnold & Porter to Helen to effectuate her intent.

In sustaining the demurrer the superior court found the pleading was fatally deficient based on the language used in the DNS Trust. Specifically, it determined Helen had granted a disinterested trustee the discretionary authority to transfer all of the assets of the Marital Trust to the Survivor's Trust for any purpose, and therefore as Ron had failed to allege facts calling into question Richardson's status as a disinterested trustee, no challenge could be made to his transfer of assets.

In reviewing the ruling on demurrer, "[w]e independently evaluate the [pleading], construing it liberally, giving it a reasonable interpretation, reading it as a whole, and viewing its parts in context. [Citation.] Treating as true all material facts properly pleaded, we determine de novo whether the factual allegations . . . are adequate to state a cause of action under any legal theory." (*Burns v. Neiman Marcus Group, Inc.* (2009) 173 Cal.App.4th 479, 486.) Doing so, we conclude the superior court's reasons for sustaining the demurrer cannot be upheld.

8

First, we find unavailing the superior court's reliance on the purportedly "clear" language used in the DNS Trust as we do not find the terms therein to be so unambiguous that an evaluation of extrinsic evidence is not required. "In order to determine initially whether the terms of *any written instrument* are clear, definite and free from ambiguity the court must examine the instrument in the light of the circumstances surrounding[] its execution so as to ascertain what the parties meant by the words used. Only then can it be determined whether the seemingly clear language of the instrument is in fact ambiguous. 'Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended.' " (*Estate of Russell* (1968) 69 Cal.2d 200, 208-209; accord, Prob. Code, § 21102, subds. (a), (c) ["[t]he intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument;" but "[n]othing in this section limits the use of extrinsic evidence, to the extent otherwise authorized by law, to determine the intention of the transferor"]; see *Estate of Cairns* (2010) 188 Cal.App.4th 937, 947-948 ["[p]rovisions in a testamentary instrument are to be given a liberal and reasonable interpretation rather than a narrow and technical one, with a view to discovering the decedent's testamentary intent, and the

9

apparent meaning of particular words, phrases and provisions is to be subordinated to the testator's plan or dominant purpose"].)

Because a demurrer concerns only the factual allegations of the pleading, we conclude the superior court erred in sustaining the demurrer based on its interpretation of the language in the DNS Trust, and without a consideration of the "circumstances surrounding the execution of the document in order to ascertain what the parties meant by the words used." (*Wells Fargo Bank v. Huse* (1976) 57 Cal.App.3d 927, 932-933 (*Wells Fargo Bank*); see also *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 ["[i]t is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence]; *Estate of Platt* (1942) 21 Cal.2d 343, 352 ["[a]n appellate court is not bound by a construction of the contract solely upon the terms of the written instrument without the aid of evidence"]; *Safai v. Safai* (2008) 164 Cal.App.4th 233, 244 ["[i]n ascertaining the trustor's intent, [the court] look[s] first to the terms of the trust, though extrinsic evidence is admissible to ascertain the meaning of the trust and the intent of the trustor"].) Significant here is the fact that "the cases emphasize that among the circumstances to be considered are relevant statutes, case law and public policy in effect at the time of the execution of the document which, in the absence of a contrary intent, are deemed to become a part of the testamentary scheme." (*Wells Fargo Bank*, *supra*, at p. 933.) We therefore reject the arguments of Richardson and Arnold & Porter that an interpretation of the language in the DNS Trust must be made without any consideration of Helen's testamentary intent or the tax

10

laws that may have been extant at the time of the creation of the DNS Trust.

We also find unavailing the superior court's rationale for sustaining the demurrer on the basis that Ron had purportedly failed to allege facts showing Richardson was not a disinterested trustee as his status as a disinterested trustee does not insulate his discretionary actions from court review. "It is contrary to sound policy, and a contradiction in terms, to permit the settlor to relieve a 'trustee' of all accountability. [Citation.] Once it is determined that the authority over trust distributions is held [by a] trustee . . ., [e]ven under the broadest grant of fiduciary discretion, a trustee must act honestly and in a state of mind contemplated by the settlor. Thus, the court[s] will not permit the trustee to act in bad faith or for some purpose or motive other than to accomplish the purposes of the discretionary power." (Rest.3d Trusts (2003, Oct. 2021 Update) § 50, com. subsec. 1 (c); see *Estate of Ferrall* (1953) 41 Cal.2d 166, 174 (*Ferrall*) [" '[i]t is against public policy to permit the settlor to relieve the trustee of all accountability to the courts,' " quoting Rest. Trusts, § 187, com. k]; *Coberly v. Superior Court* (1965) 231 Cal.App.2d 685, 689 [the grant of absolute discretion "does not authorize a trustee to neglect its trust or abdicate its judgment"]; accord, Prob. Code, § 16081, subd. (a) ["if a trust instrument confers 'absolute,' 'sole,' or 'uncontrolled' discretion on a trustee, the trustee shall act in accordance with fiduciary principles and shall not act in bad faith or in disregard of the purposes of the trust"].)

We therefore conclude that even if the DNS Trust is construed to allow a disinterested trustee to exercise unbridled discretion in

11

transferring assets from the Marital Trust to the Survivor's Trust, and Richardson is found to be a disinterested trustee (an issue we need not now decide), his exercise of his discretionary authority is not "beyond court review. If it were exercised fraudulently, in bad faith or in an abuse of discretion, it is subject to such review. Whether good faith has been exercised, or whether fraud, bad faith or an abuse of discretion has been committed is always subject to consideration by the court upon appropriate allegations and proof. [Citations.]" (*Ferrall*, *supr*a, 41 Cal.2d at pp. 173-174.)

We also see no merit to Richardson and Arnold & Porter's argument that the second amended petition includes allegations of *other* misconduct, unrelated to the transfer of assets from the Marital Trust to the Survivor's Trust. On demurrer, " 'the complaint will be held good, although the facts may not be clearly stated, or may be intermingled with a statement of other facts irrelevant to the cause of action shown, or although the plaintiff may demand relief to which he is not entitled under the facts alleged.' " (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572.)

Accordingly, we reverse the judgment of dismissal in favor of Richardson and Arnold & Porter as the second amended petition's allegations are sufficient to withstand demurrer. Whether Ron will be able to establish his claims is not before us, and our decision is not to be read as expressing an opinion on that issue, which will be resolved in future proceedings.[6]

## DISPOSITION

---

[6] In light of our determination, we do not address the parties' other contentions.

12

The judgment of dismissal in favor of defendants Thomas Richardson and Arnold & Porter Kaye Scholar, LLP, is reversed. The matter is remanded to the superior court with directions to vacate its order sustaining the demurrer to the second amended petition, and issue a new order overruling the demurrer. Plaintiff Ronald Diller is awarded costs on this appeal.

_____

Petrou, J.


WE CONCUR:


_____

Fujisaki, Acting P.J.


_____

Rodríguez, J.


A162139/*Diller v. Richardson*


14